FILED
2018 Dec-18  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

UNITED STATES OF AMERICA,     *
                                      7:18-cr-541-LSC-TMP
                              *
    vs.                         December 17, 2018
                              *   11:00
ALAA MOHD ABUSAAD,
                              *   Birmingham, Alabama
        Defendant.
                              *

* * * * * * * * * * * * * * * * * * * * * * * * * * *

**TRANSCRIPT OF DETENTION HEARING**
**BEFORE THE HONORABLE T. MICHAEL PUTNAM**
**UNITED STATES MAGISTRATE JUDGE**

* * * * * * * * * * * * * * * * * * * * * * * *  * * * * *

For the USA:          Henry B. Cornelius, Jr.
                      Manu Balachandran


For the Defendant:   Samuel R. Holmes


Court Reporter:      Leah S. Turner, RMR, CRR

1      This cause came to be heard and was heard on the
2  17th day of December 2018, before the Honorable T. Michael
   Putnam, United States Magistrate Judge, holding court for
   United States District Court, Northern District of Alabama,
3  Western Division, in Birmingham, Alabama.

4          Proceedings continued as follows:

5              P R O C E E D I N G S

6          (COURT CALLED TO ORDER.)

7          THE COURT:  This is in the matter of United States

8  of America versus Alaa Mohd Abusaad and that is case

9  No. 7:18-cr-541-LSC-TMP.

10         This is a continuation of the hearing on the

11 government's motion for detention.  We began the hearing last

12 week and continued it, recessed it and continued it until

13 today to give defense counsel an opportunity to explore some

14 issues regarding housing for the defendant.

15         Mr. Holmes, do you wish to proceed further?

16         MR. HOLMES:  Yes, Your Honor.  Would you like me to

17 update you?

18         THE COURT:  If you would, if you have a proffer, a

19 witness, whatever you want to do.

20         MR. HOLMES:  Just a proffer.  No witnesses, Your

21 Honor.  We left off last week with the understanding that if

22 she were released, she would be living with her family, which

23 was brought to our attention that they reside in a federal

24 housing authority home, and the Court gave me the opportunity

25 to go out and see if that would, in fact, be allowed.

1      We were originally told after we spoke with them

2  that this would be okay, that she was still on the initial

3  lease and that that lease expired December 31st of 2018 and

4  then she would be allowed to sign another lease for a term of

5  one year.

6      I received a call Friday afternoon from Dennis

7  Stevenson, which is the attorney for the housing authority,

8  and he and I spoke and he inquired about a few things and

9  said, look, there's no way that she is going to be allowed to

10 re-sign the lease because, one, she is married, she has her

11 own family now, so she would not be allowed -- the fact that

12 she lives in Ohio but here.  So cleared the air; can't live

13 there; can't reside there whatsoever.  She can stay there

14 through December 31st and be a guest for 14 days, which does

15 not really help because the case is certainly going to take

16 longer than that.

17     So I met with the family and they inquired if they

18 went and got an apartment in the Northern District and the

19 mother resided there alone with the defendant with no

20 Internet, no cell phone service, nothing, basically a holding

21 cell for the defendant, if I thought that would work.  And

22 this conversation now is transpiring after 5:00 on Friday

23 because we didn't get the word from Stevenson until 4:30 on

24 Friday.

25     So over the weekend, they did their due diligence,

1   they found a place in Tuscaloosa.  The brother is there now

2   with the apartment complex.  The lease is executed.  The

3   background check has been done on Ms. Abusaad.  I have the

4   location, the telephone number of who you would need to speak

5   with.  And all this information I would have already provided

6   to Ms. Sheperd, but literally, Your Honor, he is sitting there

7   now.

8        So since I've been sitting at this table, I received

9   the confirmation that the background check went through, that

10   they know about the pending federal charges, and that she is

11   good to reside there.

12        THE COURT:  Can you just give us the address or the

13   location or something of that sort?

14        MR. HOLMES:  Yes, sir, Your Honor.  It's Legacy

15   Apartments in Tuscaloosa, Alabama.  It's 1601 Mimosa Park

16   Road, Tuscaloosa, Alabama 35405.  The contact person in the

17   leasing office is Valinda.  Her telephone, 205-345-2081.

18        THE COURT:  And the arrangement would be, as I

19   understand what you're saying, is that Ms. Abusaad's mother

20   would reside in that apartment with Ms. Abusaad and act as her

21   third-party custodian in that regard?

22        MR. HOLMES:  That's correct, Your Honor.

23        THE COURT:  There would be no Internet connection.

24   Would there be a land line telephone for purposes of

25   electronic monitoring?

1        MR. HOLMES:  I have already spoken with the family

2    in anticipation that that would be one of the conditions that

3    the Court would put on the defendant, so they are in the works

4    of getting a home line.  They were in the works of getting a

5    home line at the home where they reside now, but after the

6    hearing last week, I just had my doubts.  So I suggested they

7    maybe hold off on that and let's find a new place, but they

8    are communicating with the phone company.

9        THE COURT:  What do we know about Ms. Abusaad's

10   passport situation?  I'm a little bit unclear as to whether

11   that has been surrendered, whether it's in Ohio, wherever it

12   may be.

13       MR. HOLMES:  Your Honor, it's my understanding that

14   it was seized by the government at the time of the arrest.

15   But I haven't received any discovery so I'm not -- I'm not at

16   liberty to say that for certain.

17       THE COURT:  Mr. Cornelius, do you know anything

18   about the passport?

19       MR. CORNELIUS:  I don't, Your Honor, other than what

20   Ms. Abusaad told the pretrial services report writer in Ohio,

21   that the passport had been left at her apartment.

22       MR. HOLMES:  And, Your Honor, I think in that same

23   affidavit and newspaper article, it was noted that -- I think

24   the agents went back to that apartment and confiscated a lot

25   of material.  I don't know if it was specific about a passport

1    and any identification, but I feel certain that if that's

2    something the Court wants to find out, we can find out the

3    information.

4           THE COURT:  Does she have one passport, just one

5    passport?

6           MR. HOLMES:  She has one passport, Your Honor, and

7    one driver's license that was issued in the state of Alabama,

8    and she said that was seized.  When they arrested her, they

9    took her wallet and it had those identifiers, but the passport

10   was back at the apartment.

11          THE COURT:  All right.  Mr. Cornelius, do you wish

12   to have any witness called to examine the proffers that

13   Mr. Holmes is making?

14          MR. CORNELIUS:  No, Your Honor.  I've got some

15   additional proffers of my own and then I would like to argue,

16   if I could argue in rebuttal whenever he is --

17          THE COURT:  Mr. Holmes, do you have anything else

18   you wish to offer, proffers, witnesses?

19          MR. HOLMES:  I do not, Your Honor, other than making

20   a proffer on the mother, that she is willing to be the third

21   party custodian.  The family, not only the mother but the

22   entire family that resides in Tuscaloosa, is willing to abide

23   by any condition this Court puts on them.

24          THE COURT:  Is the mother a naturalized citizen?

25          MR. HOLMES:  Yes, Your Honor.

1           THE COURT:  Do you know when she was naturalized?

2           MR. HOLMES:  That, I do not know.  She is present in

3 the courtroom, and I can find that information out easily.

4           THE COURT:  Please.  Thank you.

5           MR. HOLMES:  Your Honor, it was late 1988 or early

6 1999 -- 1998.

7           THE COURT:  So approximately 20 years ago?

8           MR. HOLMES:  Correct, Your Honor.

9           THE COURT:  Does she have a passport, United States

10 passport?

11           MR. HOLMES:  Yes, Your Honor, which she would be

12 willing to surrender.  I've had multiple conversations with

13 the family, Your Honor, and truly I feel confident standing

14 here saying that any condition this Court puts on the

15 defendant or the family as far as transportation,

16 communication, residence, that everyone would understand and

17 abide by.

18           THE COURT:  All right.  I think I remember you

19 telling me that the mother is not employed, so she would be

20 able to be there at the apartment 24 hours a day, essentially?

21           MR. HOLMES:  Full time.

22           THE COURT:  And I assume -- I don't know if there's

23 been a check on this, but I assume that the mother herself has

24 no felony criminal conviction of any sort in the United

25 States?

1          MR. HOLMES:  That's correct, Your Honor, and I have

2     had my office run a background check on every family member

3     and there's no criminal history on any family member.

4          THE COURT:  Anything else, Mr. Holmes?

5          MR. HOLMES:  That's all.

6          THE COURT:  Mr. Cornelius?

7          MR. CORNELIUS:  In the way of additional proffers,

8     Your Honor, she does have a passport because she and two of

9     her other daughters traveled to the United Kingdom and Turkey

10    within the past 90 days, including Noor would travel to the

11    U.K. and to Turkey with the mother within the past 90 days.

12    Noor was present with and shares her sister's very ideology.

13    She met with the undercover.  The very sister, these vetted

14    family members, at least one of them shares the same ideology,

15    and expressed operational security and trade crafts such as

16    hide your phone; the FBI can listen to you.

17          So Mr. Holmes, I respect him; he is doing a good

18    job; but his client said these words:  May Allah blind the

19    Kufar.

20          Just for the record, we are the Kufar.

21          And so even though he is not asking you to assist

22    her in blinding us, that is what she wants, and all her people

23    back here, too, probably.  I think it's imperative to build

24    for the record -- that I put some things on the record that

25    are necessary.

1          Mr. Holmes -- first of all, the defendant has not

2     rebutted the presumption, in my humble opinion.  At best, they

3     have said she won't be a risk of flight because no one on this

4     side of the courtroom is going to have cell phones.  There's

5     no way to verify that, of course.  And the crime -- she was a

6     prolific user of social media and a prolific user of the

7     mobile messaging application that she used to commit the

8     crime, which you can have from any cell phone.

9          So I would submit that, first of all, he hasn't

10    rebutted the presumption about the risk of flight.  No. 2, he

11    absolutely hasn't rebutted the presumption about

12    dangerousness, because she can commit the very crime and can

13    continue to do it with her sister, who is probably in this

14    courtroom right now.  And here is what -- this is at a

15    meeting, an in-person undercover meeting in Tuscaloosa,

16    Alabama where Ms. Abusaad is talking again about incryption

17    and how to try to defeat the FBI surveillance.  But they're in

18    here and I guess it's a new day and we've turned over a new

19    leaf; we're not going to try to defeat the FBI surveillance

20    anymore.

21          And the sister, Noor, is there and she has something

22    to offer on this.  This is Noor, the sister who at least as of

23    a week ago the defense was telling us they would be all living

24    together in the apartment without their cell phones.

25          Noor:  You should also be careful with your phone.

1          And then Alaa says, Whenever we are talking, the

2     phone can record.

3          And Noor says, Yes.  That's why I always stuff my

4     phone somewhere where we can't listen.

5          Noor says, Just put it on that pillow right there.

6          The UC, feigning ignorance, says, Even with iPhones?

7          Noor:  Uh-huh.

8          The defendant:  Oh, even with iPhones.

9          And so I would be wary, Your Honor, of putting too

10    much stock in the proffer that these people are going to watch

11    her and keep her from doing wrong.

12          The international travel is worrisome with the

13    mother and Noor and the other sister.  They live in Section 8

14    housing but they are traveling internationally.

15          He will learn in evidence that Ms. Abusaad before we

16    were ever a gleam in anybody's eye, she was sending money to

17    Turkey on at least three different occasions using a fake

18    name, using Papa John's as the ostensible sender address

19    through Western Union, and cash.  So she is sending money in a

20    fake name, using a fake address, in cash, to Turkey, which

21    this will come out in evidence that's a common way to get

22    money into the fight over there.  But contemporaneously with

23    that, she is sending money in true name linked directly to her

24    bank account in smaller amounts to supposedly legitimate

25    Islamic charities, which that goes hand in hand with --

1   operational trade craft goes hand in hand with we really -- I

2   submit, with all due respect, there's no way we can trust this

3   defendant to not commit a crime and not to flee.

4          And so, Your Honor I wanted to kind of remind

5   everybody just as a legal matter, I submit he has not rebutted

6   the presumption and, therefore, it's not rebutted.  And,

7   therefore, the presumption is detention.  And even if he has,

8   in your estimation, even if he has rebutted not just one but

9   both prongs because as Your Honor well knows, either one of

10  them is sufficient for detention, it's still a matter of

11  evidence to be considered as Your Honor has obviously and you

12  have written to that precise point before in other orders.

13         I wanted to kind of end with what was found, just to

14  remind the Court.  I'm not going to show him respect but his

15  name is Anwar al-Awlaki and he is one of the most revered

16  characters in the violent Jihadist pantheon of people to

17  respect.  He had a sermon, 44 ways to support Jihad, and that

18  is also a revered sermon for people who share that ideology.

19  And Ms. Abusaad had the screenshot referencing him and a call

20  from Syria, probably, saying it only takes $69 to support

21  Mujahideen, and she has that screenshot on her phone that we

22  found and then she references Awlaki's sermon.  And that

23  sermon -- I'm going to read to you the relevant point.

24  Whoever sponsors a fighter in the cause of Allah has fault.

25  That's what Awlaki -- that's in this revered sermon that he

1   had.  And she said to the undercover supporting Mujahideen's

2   family is like taking part in Jihad.  And she also -- the

3   defendant also said sending money is the same thing as doing

4   Jihad.  So it's nearly a perfect echo of what Awlaki said in

5   his infamous sermon.

6          And so, Judge, I'm sorry to belabor the point, but

7   the evidence is overwhelming.  She will be convicted, and the

8   guideline range is 360 months to life, which means that

9   because the statutory maximum is 20 years, she will be going

10  to prison for 20 years, I believe.

11         We have offered her a chance to cooperate and have

12  been spurned.  I don't understand.  We offered to get on a

13  plane and fly up there to Ohio to meet with her, and I was

14  told last Monday that she wanted to cooperate.  No one has

15  talked to me yet.

16         I still would submit that she shouldn't be released,

17  but I'm not just trying to be ugly.  I'm trying to do

18  everything I can to be fair.  But where we stand right now is

19  the evidence is overwhelming, she will be convicted, the

20  guideline range is 360 months to life.  That in and of itself

21  is reason to flee.  She obviously or her people obviously have

22  the means to travel internationally.  It's interesting because

23  she told pretrial services in Ohio that her plan when she got

24  released was to move back in with her husband.  Now we're

25  hearing she's going to live down here with her family.

1          Well, which is it?  Were you telling the truth to

2   pretrial services in Ohio, or are we hearing it now?  Which is

3   it?

4          So the interaction that she had with Ms. Giampietro,

5   who was interviewed by the FBI on 23 October, she,

6   Ms. Giampietro, told the FBI that that woman right there said

7   she wanted to travel to Syria, that she had talked about

8   traveling to Syria.

9          There's just no combination of conditions, Your

10  Honor, that satisfies, in my opinion, the argument for

11  release, and obviously she should be detained.  Thank you.

12          THE COURT:  Mr. Holmes?

13          MR. HOLMES:  Your Honor, may I take a very brief

14  second and ask the family a question?

15          THE COURT:  Absolutely.

16          MR. HOLMES:  Your Honor, I'll take it in the same

17  order.  I apologize if I misspoke when I said -- I thought I

18  relayed to the Court that Ms. Abusaad's mother does have a

19  passport.  If I misspoke, I do apologize, but I thought I said

20  she does have a passport and she would relinquish it.

21          THE COURT:  That's what I understood you to say.

22          MR. HOLMES:  So now, after speaking with the family,

23  everybody has a passport.  If it's a condition of the Court,

24  everybody will relinquish their passport, everyone.

25          As far as the flight risk, I hope that overcomes any

1   burden that we have to show the Court that she is not a flight

2   risk.  Everybody in her family will give up their passport.

3          Second is a threat to the community, and that's

4   based on a phone.  There are people granted a bond in

5   courtrooms every day where there are conditions or things that

6   they can and can't have, and officers have a right to go to

7   that house and search.  A phone is -- there are weapons that

8   people that are released on every bond can't have.  But there

9   are weapons the size of phones.  There are drug quantities the

10  size of phones.

11         So to say that if she is released there's no way for

12  them to monitor she has a phone, in my opinion it's easier to

13  find out if somebody has a phone than it is drugs or weapons.

14  So I feel like that argument doesn't really carry the weight

15  that the fact that she is living in a house -- and put her on

16  an ankle monitor so we will know she is in the house.  She is

17  not leaving.  Nobody has a passport.  There's no Internet

18  connection.  There's no cell phones.  Any time that the

19  federal probation wanted to go to this residence and search

20  it, that's great.

21         And, Your Honor, I'm kind of -- my hands are tied

22  because a lot of things that the government says, I can't

23  respond to because I only know what every person with Google

24  on Earth knows about this case, because it was printed.

25  That's the only thing I know about this case.

So my hands are tied in responding to a few of these things.  But I don't think an excerpt from a sermon on a phone tells the story of the type of person that this defendant is.

And one thing that I certainly want to respond to is the request for cooperation.  I was hired on this case and I think it was the very next day I got on a plane and flew to Ohio and met with the defendant.  And me and Mr. Cornelius were in communication pretty much through my travels.  The night I got there; the morning that I met with her.  And she had questions that I just could not answer without having some level of discovery in my hands.  And she was willing then to sit down and talk to the government, but she had questions of me that I couldn't give her an answer.  It took a month to get her back here.  Through the course of that month, I still don't have any discovery.  As we sit here today, I still don't have anything.

But she relayed to me, look, I am interested in talking to them.  If it will help me, I am interested in doing this.  And the government tells me last Monday, they don't want to talk to her anymore.  So to imply that we're giving a run-around, we gave a run-around and that run-around was the day that I walked out of the jail in Ohio and she told me that you don't know enough to even give me direction on whether I should cooperate or whether I shouldn't.  And honestly I still don't have an answer.  I have explained cooperation to her.

1    She understands how it works.  If she has information that

2    helps her, then she is willing to provide it to the

3    government.  But that opportunity has not arisen since she has

4    been back in Alabama.  And I'll state on the record today she

5    is not running from sitting down and talking to them, but she

6    still has questions of me that I would love the opportunity to

7    look at one document before I give her that advice.  Thank

8    you, Your Honor.

9            MR. CORNELIUS:  Judge, can I respond?

10           THE COURT:  Please.

11           MR. CORNELIUS:  I'm going to start there at the end.

12   We have gotten the run-around.  It has been raised by the

13   defense not once but twice.  I have given him -- I've

14   encouraged him to call me on my cell phone and tell me what it

15   is that she wanted to discuss with me, because I was told

16   after the initial appearance that she wanted to talk to the

17   government, and I emailed Sam and said, Call me and let me

18   know what it is she wants to talk about, because as I told you

19   a month ago, her utility to the government dissipated with

20   time and the more people we have continued to talk about --

21   which Mr. Holmes is no stranger to that.  He knows how that

22   works.  And I'm going to comply with the orders of the Court

23   for turning over discovery as soon as we get a protective

24   order filed, file a motion for protective order.  We have some

25   ready to go, and it's going to have to come in phases.

1      I'm not going to sit down and let somebody cooperate
2  with me after they know -- you know, I can't vet them anymore,
3  and then they know what I know.  And he knows that, and I told
4  him that.  So for whatever reason they decided not to do it
5  the normal way, which is to sit down, tell the government
6  everything you know, and then we can decide -- obviously we've
7  got a few people interested in this case, and there was a time
8  that she probably could have helped herself and her country,
9  if she cares about that anymore.  I don't know that that time
10  exists anymore based on what has gone on in the past month.

11      There's no more I can say about that, but I've got
12  to respond to the sermon piece.  It's not just one quote from
13  this horrible human being, Awlaki.  It's everything she was
14  saying to the UC.  Blind the Kufar.  It's virulent.  It's not
15  just one little isolated quote from one sermon.  And she is
16  using the same language essentially that Awlaki used in her
17  encouraging of the UC.  And so it's an accidental misstatement
18  on Mr. Holmes' part to cast this as it's just one thing, from
19  one quote, from one time.

20      Your Honor, I know I have beat a dead horse.  I do
21  this work.  This is what I do.  And I have been working with
22  her since December 2016.  I know her better than Mr. Holmes
23  knows her.  She is an abject danger to the community.  She can
24  commit this crime from any street corner in America with a
25  smartphone again.

1   So there's really no way to police it.  It's

2   fanciful to say -- you can order it, of course, but there's

3   nothing to stop anybody over here from giving her a phone or

4   she gets a phone, however she wants, and the local wifi, and

5   doing the same thing again.  Thank you.

6   THE COURT:  Mr. Holmes, anything?

7   MR. HOLMES:  Very briefly, Your Honor.  I do want to

8   apologize if I have misrepresented anything, but it just kind

9   of goes to where I am with my hands tied.  And I try to

10   respond to things that I hear in the courtroom, but I haven't

11   seen anything.  So the sermons, the evidence, I can't respond

12   to this because I haven't seen it.  I know it's a little

13   unorthodox.  These cases aren't as common as your regular drug

14   case or gun case, but I just feel like the Court can put a

15   condition or conditions, many conditions, on this defendant

16   and her family to where the Court would be comfortable that

17   she can abide by these conditions and not a flight risk and is

18   not a threat to the community, and those are the two things

19   that the government has their biggest concerns with.  Your

20   Honor, I think we have overcome that because the family is

21   willing to do whatever it takes.  So I think the Court can be

22   very creative in any condition that they may or may not want

23   to put on this defendant as far as -- nothing can be done from

24   a street corner if you can't get off the couch.

25   So I think there are conditions that this Court

1   could impose on this defendant that would ensure her return to

2   Court, not being a flight risk, and any threat to the

3   community.  Your Honor, we would ask that she be released to

4   her mother as a third-party custodian and be allowed to live

5   in the residence in Tuscaloosa that I provided the Court

6   earlier.  Thank you.

7          MR. CORNELIUS:  Judge, I need to respond to

8   something he said, if I could.  He said a couple of times that

9   his hands are tied, he doesn't have a way -- most of it is in

10  the affidavit.  Things like I have given many, many times

11  before.  Things like Allah protected me every time.  Like I

12  use to be Jo Jo and that was really dangerous, so I think this

13  mobile messaging application is pretty safe.  I have already

14  referenced supporting Mujahideen's family is like taking part

15  in Jihad.  You can't have a war without bullets and weapons.

16         This is her encouraging the UC:  Don't give your

17  real information.  I looked up random places and gave the

18  address and random phone numbers, but I did it multiple times

19  and I never got in trouble.  May Allah blind the Kufar.

20         And that's from paragraph 12 of the complaint -- the

21  affidavit, which is Government's Exhibit No. 1, I believe, in

22  the detention hearing record.  And we would ask that Your

23  Honor take that into account as well.  Thank you.

24         THE COURT:  Mr. Holmes?

25         MR. HOLMES:  Your Honor, a perfect example is what

1   Mr. Cornelius just said; she gave many, many times.  Well,
2   from reading the complaint and the affidavit you will see that
3   every conversation she starts out with giving to a legitimate
4   source, not a terrorist organization.  So those are the kind
5   of things that I would like to see the track record.  There
6   were many, many times that she gave money, but I feel like as
7   thorough as they were with this newspaper article in this
8   complaint and this affidavit, that the many, many times were
9   left out, the good ones, and the occasional bad ones were
10  certainly emphasized.  I don't know that to be true.  That's
11  the way I read it.  I think that's the way everybody on the
12  globe read it.

13          So it's our position that we need these other
14  messages, these other contributions to actually defend the
15  defendant properly.

16          So I think it supports our position that the
17  affidavit and complaint mentions many, many, many, but only
18  references specific a couple.  Thank you, Your Honor.

19          THE COURT:  All right.  I'm going to have the
20  probation office check on the proposed apartment just follow
21  up and see if that's available, what the conditions are,
22  whether it's an appropriate place and give them this afternoon
23  to do that, and I will take it under advisement and try to get
24  you a decision tomorrow.

25          MR. HOLMES:  Thank you, Your Honor.

1          THE COURT:  Anything else?

2          MR. CORNELIUS:  Yes, Your Honor.  In the event that

3   Your Honor was inclined to release her on bail, we -- I'm not

4   familiar with how to do this.  I have never done it before.

5          THE COURT:  My standard practice is if the

6   government asks for a 24-hour stay of the release, then I'll

7   grant the 24-hour stay.  That gives you an opportunity to get

8   before a district judge before she is actually released.

9          MR. HOLMES:  So is that something -- forgive me.  We

10  will find out when the written order is entered?

11         THE COURT:  Yes.  If I conclude that there are

12  conditions under which Ms. Abusaad can be released, then what

13  I will do is set another proceeding here in the courtroom and

14  notify everybody to be present so that we can go through the

15  conditions and you can be aware as well as she can be aware

16  and anyone else can be aware of what those conditions are.

17  And at that point then I will sign an actual order of release

18  but then stay that order for 24 hours to give the government

19  an opportunity to get before a district judge and either get

20  the stay extended or whatever the district judge may do on it.

21         So you will be aware of when I sign the order of

22  release and you will be given a 24-hour stay from that time to

23  do whatever else.  And if the district judge extends the stay

24  or stays it on his or her own, then certainly that stops

25  everything, but if the district judge doesn't do anything

1  within 24 hours, the release order would take effect then at

2  that time, 24 hours later.

3          MR. CORNELIUS:  So there's nothing procedurally ––

4  did I hear you say that it will be already in your order, the

5  24-hour stay will already be written in there, so there's

6  nothing affirmative I would need to do to request the stay to

7  take our appeal?

8          THE COURT:  What I typically do is after I go

9  through the conditions of release with the defendant, I then

10  ask the government do you wish to have a 24-hour stay, and you

11  can state that on the record and I'll grant that 24 hour stay.

12          MR. CORNELIUS:  Thank you, Judge.

13          THE COURT:  All right.  Any other questions,

14  Mr. Cornelius?

15          MR. CORNELIUS:  No, Your Honor.

16          THE COURT:  Mr. Holmes?

17          MR. HOLMES:  No.  Thank you.

18          THE COURT:  All right.  I will take it under

19  submission after I hear from the probation office and I will

20  try to get you a decision tomorrow sometime.  Thank you.

21          (End of proceedings.)

22

23

24

25

C E R T I F I C A T I O N

        I hereby certify that the foregoing transcript
in the above-styled cause is true and accurate.


                **Leah S. Turner, RMR, CRR**
              **Federal Official Court Reporter**