1     UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ALABAMA
2       WESTERN DIVISION

3 THE UNITED STATES OF AMERICA, | CASE NO. 7:18-cr-00541-LSC-TMP

4     Plaintiff, | T. MICHAEL PUTNAM
            | United States Magistrate Judge
5 v.         |

6 ALAA MOHD ABUSAAD,   | December 10, 2018
            | 2:09 p.m.
7     Defendant. | Birmingham, Alabama

8

9    **<u>ARRAIGNMENT AND DETENTION HEARING</u>**

10

11 FOR THE GOVERNMENT:   Henry B. Cornelius, Jr.
             Assistant United States Attorney
12            United States Attorney's Office
             Northern District of Alabama
13            1801 Fourth Avenue North
             Birmingham, Alabama 35203
14            205-244-2001
             Henry.cornelius@usdoj.gov
15

16 FOR THE DEFENDANT:    Samuel R. Holmes
             Holmes Law Firm LLC
17            2027 2nd Avenue North
             Birmingham, Alabama 35203
18            205-249-5774
             Srh@holmeslawfirm-al.com
19

20

21 Proceedings recorded by mechanical stenography, transcript
      produced by computer.
22

23     **SABRINA LEWIS, CCR, RDR, CRR**
      Federal Official Court Reporter
       1729 Fifth Avenue North
24      Birmingham, Alabama 35203
        (205) 278-2065
25    sabrina_lewis@alnd.uscourts.gov

1    THE COURT:  This is in the matter of United States of

2  America v. Alaa Mohd Abusaad, and that is Case Number

3  7:18-cr-541-LSC-TMP.  And we're in court at this time for

4  purposes of arraignment and hearing the government's motion

5  for detention.

6    Ms. Abusaad, you previously appeared at an initial

7  appearance last week.  And I explained to you then certain

8  constitutional rights that you're entitled to, but let me

9  explain those to you again just so that there's no

10  question.

11    First, you have the right to remain silent.  You don't

12  have to say anything to me or to the court officials,

13  marshals, probation officers, or anyone else about the

14  facts of the charge against you.  You have the perfect

15  right to remain silent.

16    If you begin to make a statement about the facts of the

17  charge, you can stop making that statement at any time.

18  Just because you begin to say something about the charge

19  does not mean that you have to complete that statement.

20  You can stop at any time and invoke your right to remain

21  silent.

22    You should understand, though, that if you do make a

23  statement, whether it's a full statement or a partial

24  statement, whether it's in writing or oral, whatever you

25  say can and may be used as evidence against you in the

1    prosecution of the charge.  Do you understand that?

2       THE DEFENDANT:  Yes.

3       THE COURT:  All right.  You have the right to the

4    assistance and representation of an attorney.  And I know

5    that you have retained Mr. Holmes here to represent you,

6    but keep in mind that at any time that you may need the

7    assistance of an attorney, you have the right to ask the

8    court to appoint an attorney for you if the need should

9    arise.  Do you understand that?

10       THE DEFENDANT:  Yes.

11       THE COURT:  Mr. Holmes, let me go ahead and get you to

12    state your appearance for the record, please.

13       MR. HOLMES:  Thank you, Your Honor.  Sam Holmes,

14    2027 2nd Avenue North, Birmingham, Alabama, 35203.

15    Telephone, 205-249-5774.

16       THE COURT:  Thank you, sir.

17       On this indictment, Ms. Abusaad, you have the right to

18    have a public speedy jury trial.  A jury trial is one in

19    which 12 citizens of the district are selected to hear the

20    evidence in the case and make a decision regarding your

21    guilt or innocence of this charge.  And at that trial, you

22    are presumed innocent and the jury is instructed to presume

23    that you are innocent unless and until the government

24    carries its burden of proving the charge against you beyond

25    a reasonable doubt.  You're not required to prove or

1   disprove anything.  The entire burden of proof is on the

2   government to prove the charge against you beyond a

3   reasonable doubt.

4       At trial, you have a right to confront and

5   cross-examine the government's witnesses against you.  That

6   means you have the right to see, hear, face, and question

7   the witnesses that the government would call to testify.

8       You also have a right to subpoena and present any

9   defense witnesses you wish to offer.  That means you have

10  the right to use the Court's power to compel people to come

11  into court and testify on your behalf.

12      You also have a right to testify yourself if you choose

13  to do so, but that's entirely your choice.  No one can make

14  you testify, nor can anyone stop you from testifying if

15  that's what you decide you wish to do at trial.

16      Do you understand that, Ms. Abusaad?

17      THE DEFENDANT:  Yes.

18      THE COURT:  Do you have any questions about any of

19  those rights so far?

20      THE DEFENDANT:  No.

21      THE COURT:  All right.

22      As I said, you are now charged in an indictment that

23  was returned by the grand jury on October 30, 2018.  And

24  it's fairly short, so I will read it to you.  It reads

25  "Count 1:  Beginning on a date unknown but no later than in

1  and around February 2018 and continuing until on or about

2  April 21, 2018, in Tuscaloosa County, within the Northern

3  District of Alabama and elsewhere, the defendant, Alaa Mohd

4  Abusaad, did knowingly attempt to provide material support

5  or resources, as that term is defined in Title 18, United

6  States Code, Section 2339(A)(b), including money and

7  services, to a foreign terrorist organization, that is,

8  al Qaeda, which at all relevant times was designated by the

9  Secretary of State as a foreign terrorist organization

10  pursuant to Section 219 of the Immigration and Nationality

11  Act, knowing that al Qaeda was a designated foreign

12  terrorist organization as defined in Title 18, United

13  States Code, Section 2339(g)(6), and al Qaeda engages and

14  has engaged in terrorist activity as defined in

15  Section 212(a)(3)(B) of the Immigration and Nationality Act

16  and that al Qaeda engages and has engaged in terrorism as

17  defined in Section 140(d)(2) of the Foreign Relations

18  Authorization Act, fiscal years 1988 and 1989, in violation

19  of Title 18, United States Code, Section 2339(B)(a)(1) and

20  2."

21       Now, as I said, Ms. Abusaad, this is not a time you're

22  called on to make any defense or explanation.  But I do

23  need to make sure that you understand what the charge is,

24  not that you admit to it or agree with it but that you

25  understand the charge.  Do you understand the charge?

1    THE DEFENDANT:  Yes.

2    THE COURT:  All right.  And having been served with --

3    And, Mr. Holmes, has she been served with a copy of the

4  indictment?

5    MR. HOLMES:  She has, Your Honor.

6    THE COURT:  All right.

7    Having been served with a copy of indictment and my

8  having read it to you and you expressing your understanding

9  of the charge, to the indictment, Ms. Abusaad, do you enter

10  a plea of not guilty?

11    THE DEFENDANT:  Not guilty.  Yes.  Not guilty.

12    THE COURT:  A plea of not guilty will be entered for

13  the defendant.

14    With that arraignment, the case is now scheduled for

15  trial before Judge Coogler on February 4.  So this will be

16  on the February 4 trial docket barring any kind of change

17  in that schedule.  So it is currently scheduled now for

18  February 4, 2019, for trial.

19    Is the government ready to proceed on the motion for

20  detention?

21    MR. CORNELIUS:  Yes, Your Honor.

22    THE COURT:  Is the defendant ready, Mr. Holmes?

23    MR. HOLMES:  Yes, Your Honor.

24    THE COURT:  All right.  Go ahead, Mr. Cornelius.

25    MR. CORNELIUS:  Your Honor, first of all, we'd request

1    the rule if that's appropriate in this setting.

2        THE COURT:  Yes.

3        Under the Federal Rules of Evidence, if you expect to

4    be called as a witness -- if you expect to be called as a

5    witness in this matter, please wait out in the hall until

6    you're asked to come in to testify.  If you're going to be

7    a witness, please wait out in the hall.

8        And I would ask the attorneys to help me enforce that,

9    please.

10       MR. HOLMES:  Your Honor, may I speak with the family

11   briefly?

12       THE COURT:  You may.  Certainly.

13   (Pause.)

14       THE COURT:  All right.  Go ahead, Mr. Cornelius.

15       MR. CORNELIUS:  Your Honor, first of all, I want to let

16   the court know that with regard to the February 4 trial

17   date, we do intend to file some motions in this case.

18       THE COURT:  I understand.

19       MR. CORNELIUS:  And the second thing I wanted to say,

20   Judge, is that Mr. Holmes has said he has no objection to

21   us proceeding by proffer.  I know that -- but, obviously,

22   I'll proceed at your instruction.  You know, we'll proceed

23   by proffer.  I'm happy -- I have a witness here to call as

24   well, however you'd like.

25       THE COURT:  Why don't we -- and I understand that the

1  proffer is an allowable procedure.  But I think given the
2  issues in this case, let's go ahead and proceed by witness
3  in the case.
4      MR. CORNELIUS:  Yes, Your Honor.  I'm going to call
5  Paul Jones to the stand.
6      THE COURT:  All right.
7  (Witness sworn.)
8      THE COURTROOM DEPUTY:  Please state and spell your
9  first and last name for the record.
10     THE WITNESS:  My name is Paul Jones.
11     MR. CORNELIUS:  Your Honor, before we begin, I've got
12  something I'd like to -- I need to put on the record.
13     As I believe the court knows, this case and this
14  investigation leading up to the case involves classified
15  information.  This hearing is, as Your Honor knows, is not
16  an appropriate setting for discussion of classified
17  material.  Accordingly, Agent Jones has been instructed by
18  me to limit his testimony to unclassified information only.
19     THE COURT:  All right.
20     MR. CORNELIUS:  And so I just didn't want -- if there's
21  a question -- he may not be able to -- there will be
22  instances where he will not be able to give a fulsome
23  answer and things that I say to the court might not be
24  fulsome, either.  Does that make sense?  Because it will
25  call for --

1    THE COURT:  And I certainly understand that, in a

2   public setting, that you cannot get into classified

3   information.  Indeed, it raises the interesting question in

4   my own mind since, as far as I know, I haven't undergone

5   any kind of whoop-de-do magic about being cleared for

6   classified information.  So it may not be appropriate to,

7   even in a closed setting, to communicate confidential

8   information to me.

9    But, now, that does raise, then, the interesting

10   question, and we may not ever come to this bridge or have

11   to face that question, but it does raise the interesting

12   question, what if some critical element that is necessary

13   for the government's burden of proof can be established

14   only by way of some classified information?  That presents

15   me with having an absence of evidence counterbalanced

16   against the government's burden of proof.

17    So I don't want to leave the impression that simply

18   because we can't get into classified information that that

19   will be an excuse or some sort of way for the government

20   not being able to meet some burden of proof.  And maybe

21   that won't ever come up, but I want to be clear that it

22   seems to me that the government in our constitutional

23   system is still required to meet whatever burdens of proof

24   it has.

25    MR. CORNELIUS:  Yes, Your Honor.

1    May I proceed?

2    THE COURT:  Yes, please.

3    MR. CORNELIUS:  Thank you.

4                        AGENT PAUL JONES,

5    duly sworn, was examined and testified as follows:

6    DIRECT EXAMINATION BY MR. CORNELIUS:

7    Q.  State your name, please, sir.

8    A.  Paul Jones.

9    Q.  What do you do for a living?

10   A.  I'm a special agent with the Federal Bureau of

11   Investigation.

12   Q.  And what squad are you on?

13   A.  I currently serve on the counterterrorism squad in

14   Birmingham, and I'm a member of the Joint Terrorism Task

15   Force.

16   Q.  How long have you been an agent?

17   A.  Since 2014.

18   Q.  What did you do for a living before you became an agent?

19   A.  I was a noncommissioned officer in the U.S. Army.

20   Q.  What did you do?

21   A.  I was first a forward observer.  And after that, I was a

22   special forces engineer sergeant.  After that, I was a

23   special forces operations and intelligence sergeant.

24   Q.  And did you serve overseas?

25   A.  I did.  I served in Afghanistan two times and Iraq one

1    time.

2    Q.  You mentioned that you were assigned to the

3    counterterrorism squad, and you also used the words Joint

4    Terrorism Task Force, I believe.  Could you tell us what

5    that squad is and what it does?

6    A.  So the squad is a counterterrorism squad.  And as a part

7    of the Joint Terrorism Task Force, it's a task force that

8    is made up of state, local, and federal law enforcement

9    officers, analysts, and other support employees that's

10   charged with fighting terrorism, being proactive in

11   investigating acts of terrorism.

12   Q.  Okay.  During your time on that squad, have you learned

13   that there was an investigation regarding a person named

14   Alaa Abusaad?

15   A.  Yes, sir, I am.

16   Q.  You're not the case agent, correct?

17   A.  No, I'm not.

18   Q.  You just learned about the investigation; is that right?

19   A.  That's correct.

20   Q.  And have you reviewed an affidavit that was submitted to

21   Judge Putnam in support of a criminal complaint charging

22   the defendant with violating federal law?

23   A.  Yes, I've reviewed it.

24   Q.  Okay.  And I'm going to get into some specific questions

25   here -- some more detailed questions in a minute, but am I

correct that your having read that affidavit informed you

that Ms. Abusaad introduced an FBI undercover employee to a

known financial facilitator?

**A.** Yes, that's correct.

Q. And that Ms. Abusaad encouraged the UCE, the FBI

employee, to provide money to the financial facilitator?

**A.** Yes, that is correct.

Q. And that the defendant provided instructions to the UCE

about how to provide money to the facilitator?

**A.** Yes.

Q. And have you learned from that affidavit that

Ms. Abusaad confirmed with that financial facilitator that

money sent to the facilitator could be provided to a

designated foreign terrorist organization?

**A.** Yes.

Q. And that the defendant coached the UCE on operational

security methods to use in order to avoid detection by law

enforcement when sending the money?

**A.** Yes, that is correct.

Q. Okay. So with that kind of overview, when we refer to

the financial facilitator, can we refer to that person as

Individual A?

**A.** Yes.

Q. When have you learned that the defendant was introduced

to the UCE by another person?

1   **A.**   About February 2018.

2   **Q.**   Okay. And then did the two of them, meaning Ms. Abusaad

3   and the UCE, then begin communicating -- or continue

4   communicating -- forgive me -- using what we call a mobile

5   messaging application?

6   **A.**   Yes.

7   **Q.**   And what, if anything, occurred on or about March 10,

8   2018?

9   **A.**   On or about March 10 of 2018, Ms. Abusaad communicated

10   with the UCE and instructed that she had attempted to send

11   money in the past; that her husband was talking to a

12   brother he thought was in Syria and was going to help them

13   in preparing to get over there.

14   **Q.**   The UCE told Ms. Abusaad that, correct?

15   **A.**   Yes.

16   **Q.**   Uh-huh. And did the undercover ask Ms. Abusaad whether

17   or not Ms. Abusaad's contact could help with sending money

18   to the MJ?

19   **A.**   Yes.

20   **Q.**   And am I correct that Ms. Abusaad said that sending

21   money is the same as doing Jihad?

22   **A.**   Yes, that is correct.

23   **Q.**   And also on March 10, did the UCE ask Ms. Abusaad "Is

24   that what is needed right now"; that is, money?

25   **A.**   Yes, that is correct.

1  Q.  And how did Ms. Abusaad -- how did the defendant reply
2  to that?
3  A.  Ms. Abusaad replied "It's always needed.  You can't have
4  a war without weapons.  You can't prepare a soldier without
5  equipment."
6  Q.  Okay.  And I see the initials MJ.  Could you tell us
7  what that means in your assessment?
8  A.  In my assessment, the initials MJ refer to mujahedeen.
9  Q.  And am I correct that a mujahedeen means one who is --
10  in the plural form, those who are engaged in Jihad or
11  fighters and that mujahid and its variants is the singular
12  form of that word?
13  A.  Yes, that is correct.
14  Q.  And that throughout the defendant's discussions with the
15  undercover, when they used the initials MJ, it's clear that
16  they meant mujahid or mujahedeen?
17  A.  Yes, that is correct.
18  Q.  Okay.  Also on March 10, 2018, did Ms. Abusaad send the
19  UCE a screenshot of what appeared to be a user's mobile
20  messaging application contact information?
21  A.  Yes.
22  Q.  For Individual A?
23  A.  Yes, for Individual A.
24  Q.  And what, if anything, did the UCE ask Ms. Abusaad about
25  that person?

**A.** Ms. Abusaad stated that "This is the brother that I know, and he is in charge of a mobile messaging application channel."

**Q.** And did the UCE ask Ms. Abusaad "How do you know he's not a spy?"

**A.** Yes. And Ms. Abusaad replied to that by saying "I sent many, many times through him, plus he's very well-known."

**Q.** All right. But the defendant replied "Because I sent many, many times through him"; is that right?

**A.** Yes, sir.

**Q.** On or about March 12, 2018, did the two of them, meaning the defendant and the undercover, have a discussion about encrypted messages?

**A.** Yes, they did.

**Q.** Okay. And what, if anything, did the defendant say about the FBI's capabilities?

**A.** The undercover employee asked Ms. Abusaad "So why exit and delete each time?"

**Q.** Let me stop you. That means exit and delete out of the mobile messaging application, correct?

**A.** Yes, that is correct.

**Q.** Okay.

**A.** To which Ms. Abusaad replied "I guess just to gee" -- I believe she meant "get" -- "on the safe side. It's fine. This conversation is encrypted. FBI can still hack into

1  your phone, but they can't hack into this conversation."

2  Q.  And continue reading.

3  A.  "And I would not worry too much about it bc I've had

4  many conversation in this and they were pretty explicit

5  like IG" -- meaning "I guess" -- "incriminating."

6  Q.  And did the defendant say anything about any other

7  groups that she claimed to have some affinity with?

8  A.  Yes.  Ms. Abusaad stated "Allah protected me every time.

9  I mean, like I used to be Joe-Joe, and that was really

10  dangerous."

11  Q.  Am I correct that in their communications that it was

12  clear that "Joe-Joe" meant "ISIS" to the defendant?

13  A.  Yes.

14  Q.  And continuing on March 12, it's my understanding that

15  the defendant, for references in paragraph 10 of the

16  complaint affidavit, that the defendant told the UC that

17  she should talk to her husband about this first; is that

18  right?

19  A.  Yes, that's correct.

20  Q.  Okay.  And the UCE replied what?

21  A.  The UC replied "I know he wants to send something since

22  we are stuck here right now and while we save.  We talked

23  about it the other night, but for him, it's going to be

24  knowing where it would be going."

25  Q.  And what did the defendant respond?

**A.** Ms. Abusaad responded "Okay. He can say where he wants
it to go specifically. Like, for instance, if he wants it
to be zakat money, it can go to the widows of MJ. Or if he
wants, it could be for weapons, bullets, clothing. Or you
can give it to the widow and orphans. Supporting a
mujahid's family is like taking part in Jihad."

Q. So with regard to that phrase, I want to make sure I
understand something. According to what you've learned
from this affidavit, from the investigation, the defendant
talking to the UC says -- I'm paraphrasing -- "Your husband
can say where he wants it to go." The UCE's husband can
say where he wants it to go. "For instance, it can be
zakat money," which that's a charitable contribution under
Islamic law, correct?

**A.** Yes, that's correct.

Q. "Or it can go to the widows of MJ. Supporting a
mujahid's family is like taking part in Jihad," right?

**A.** Yes, that is what --

Q. That's what the defendant said to the UC?

**A.** Yes, correct.

Q. And I know we all probably know what Jihad means, but
for the record, since the defendant said "Supporting a
mujahid's family is like taking part in Jihad," what is
Jihad in this context?

**A.** In this context, it is a war.

1  Q.  Armed struggle?

2  **A.**  Yes.

3  Q.  And moving into the next paragraph just for reference,

4  was there any discussion about risk that the defendant had

5  with the undercover?

6  **A.**  Yes, there has been.

7  Q.  Tell us what that was.

8  **A.**  Ms. Abusaad stated in this mobile messaging conversation

9  "I trust (Individual A) more because I actually talked to

10  him and he's helped me when I thought I got in big trouble.

11  Once I used my debit card for a transaction that could have

12  gotten me in really big trouble, even jail.  And I

13  panicked, and I was following his channel."

14  Q.  And that's Individual A?

15  **A.**  Yes.

16  Q.  And then the defendant says that she contacted

17  Individual A, correct?

18  **A.**  Yes, that's correct.

19  Q.  And we haven't gotten there yet, but this is the same

20  person that the defendant later linked up with the UC,

21  meaning Individual A?

22  **A.**  Yes, that's correct.

23  Q.  Okay.  And am I right that later on in that same

24  conversation, that Ms. Abusaad stated to the undercover

25  "Everything is a risk.  Sending is a risk," as in sending

1    money, correct?

2    **A.**  Yes, that's correct.

3    **Q.**  "Going is a risk."  And going means going to Syria,

4    correct?

5    **A.**  Yes, correct.

6    **Q.**  And just based on your general education and training

7    and experience, am I correct that some people, for whatever

8    reason, believe and have believed for some time that it was

9    their calling to travel over there and fight the -- who

10   they regard to believe as the nonbelievers?  Is that

11   what -- to Syria?

12   **A.**  Yes, that is correct.

13   **Q.**  Okay.  Going over to -- this is at the top of page 5,

14   which is the last third or so of paragraph 11 of the

15   affidavit.  Just read that to yourself particularly with

16   regard to the Western Union part.

17       Am I right that the defendant in this same mobile

18   messaging application told the UC that "You can send money

19   to certain countries through Western Union.  It's got to be

20   under $400.  But be careful; there's always a chance of

21   getting caught"?

22   **A.**  Yes.

23   **Q.**  Okay.  And we talked about in the summary portion of

24   your testimony about tradecraft.  Can you tell us what, if

25   anything, the defendant told the UC about that in the next

1  paragraph?

2  **A.**  Yes.  The UCE specifically asked about wearing an hijab

3  and sending less than $400 and not showing i.d. with regard

4  to tradecraft, and Ms. Abusaad replied "If you aren't

5  careful of what you say and what information you give,

6  don't give your real information.  I looked up random

7  places and gave the address and random phone numbers.  But

8  I did it multiple times, and I never got in trouble."

9  Q.  "Alhamdulillah.  May Allah blind the kuffar."  Is that

10  the rest of what the defendant said during that chat?

11  **A.**  Yes.

12  Q.  And in Arabic, does the word kuffar mean infidels or

13  unbelievers in Islam?

14  **A.**  Yes, that's correct.

15  Q.  Could you read the rest of that chat for us, please.

16  **A.**  The UCE then went on to ask "It's not illegal to simply

17  send money, though, right?"  And Ms. Abusaad replied "It

18  can be.  It depends.  If you are sending to women and

19  children, it's legal, and you can do it through an official

20  charity group.  So it depends."

21      The UCE then asked "Is the MJ aspect what is illegal,

22  then?"  And Ms. Abusaad replied "Yes, it is."

23  Q.  Okay.  Skipping down, on March 25, 2018, what occurred

24  on that day?

25  **A.**  The UCE and Ms. Abusaad had another conversation via the

1  mobile messaging application.

2  Q.  And what did the defendant tell the undercover?

3  A.  Ms. Abusaad stated "I wanted to tell you that if you and

4  your husband talked and still want to donate, now is

5  probably one of the best times.  You can give regularly

6  through a charity organization like One Ummah or through

7  the brothers I forwarded you.  If not, it's completely

8  fine.  I just thought I would let you know."

9  Q.  And the undercover asked?

10  A.  The undercover then went on to say "What happened that

11  makes now a really good time?"  And Ms. Abusaad replied "I

12  talked to one of the brothers there."  The UCE then stated

13  "I know we are absolutely wanting to give to the MJ while

14  we are stuck here.  My husband is just going to want to

15  know where it's going to, if that makes sense."

16      Ms. Abusaad then replied "The brother was not part of a

17  group that participated in infighting.  You can ask for it

18  to go specifically to where you want it.  And the brother

19  said there are many groups that don't participate in the

20  infighting."

21      UCE then asked "Which brother?  (Individual A)?"

22  Ms. Abusaad then replied "He also said they are in need

23  right now, yes."

24  Q.  Okay.  And the infighting that's referred to in that

25  chat, I want to talk with you about that for a moment.

1    Is it right that during the time of the Syrian Civil War

2  that there were various groups that were fighting each

3  other and fighting the Assad regime?

4  **A.** Yes, that's accurate.

5  **Q.** Continuing on March 26, tell us what happened on that

6  day.

7  **A.** There was another conversation between the UC and

8  Ms. Abusaad on March 26 via that same mobile messaging

9  application.  Ms. Abusaad stated "There are many smaller

10  grps" -- I believe "groups" abbreviated.  She then went on

11  to name several of these groups.

12    She then said -- some of this is in shorthand, but I

13  understand it to be "Most of these groups don't take part

14  in infighting.  I usually tended to help many groups in

15  care and partially stay out of infighting."

16  **Q.** Okay.  On April 2, did the undercover ask the defendant

17  a question about whether or not Individual A could get

18  money to a certain group?

19  **A.** Yes.  The UCE asked Ms. Abusaad "Once I deposit the

20  check tomorrow, funds should be available Wednesday.  So we

21  definitely want to send something Wednesday inshallah.  But

22  Sis, can you do me a favor?  Can you ask (Individual A) if

23  he can get our money to our AQ brothers."

24  **Q.** And how did the defendant reply?

25  **A.** Ms. Abusaad replied "He said it can be done to the

brothers that work with AQ.  He knows a few."

Q.  And "AQ" is "al Qaeda"; is that correct?

A.  Yes, that's correct.

Q.  Later on in that same conversation, did the UCE ask "So how does this work, Sis?  Like, how do I send the brother the money?"  And "the brother" is Individual A, correct?

A.  Correct.

Q.  And what did the defendant say?

A.  Ms. Abusaad replied to that question "The way I know is Western Union.  Send under a fake name and fake address. Only send with one identity once.  But the name you send it to might be different each time.  So it's important to check with (Individual A) who to send to exactly."

Q.  Okay.  Am I correct that on or about April 4 -- strike that.  Let me start over again.

   Did the defendant send Individual A's contact information through that mobile messaging application?

A.  Yes.  During that same --

Q.  At some point?

A.  -- reference conversation.

Q.  And so the defendant linked up the undercover with Individual A, the person who could get the money to al Qaeda; is that correct?

A.  Yes, that's correct.

Q.  And the defendant also stated that she had sent through

1 that brother, Individual A, many, many times and trusted

2 him, correct?

3 **A.** Yes.

4 **Q.** Was money eventually sent by the undercover --

5 **A.** Yes, it was.

6 **Q.** -- to Individual A?

7 **A.** Yes.

8 **Q.** Okay. And over in paragraph 24 of the affidavit, did

9 the UCE report to the defendant that she had spoken to

10 Individual A and that Individual A had given the undercover

11 a specific name in Istanbul, Turkey, to send the money to

12 and the defendant replied "Yes, that sounds right"; is that

13 correct?

14 **A.** That is correct.

15 **Q.** Okay. And what else did Ms. Abusaad say in that

16 conversation?

17 **A.** The UCE had told Ms. Abusaad that she was nervous, and

18 Ms. Abusaad stated "Don't be nervous, Sis. And, also, you

19 need a signature. Make sure you practice-sign your fake

20 name. And, also, practice saying all the information.

21 Read it three times. Your name, the receiver's name, and

22 all of your other info. Like address and number. That's

23 so you don't make a mistake. If you are nervous, it will

24 be harder to recall. Boost your self-confidence. Tell

25 yourself there is absolutely nothing that can be done to

1    you and the plot of the Shaytan is weak, so don't worry."

2    Q.  And that's S-H-A-Y-T-A-N.  And loosely translated, that

3    means the Devil or Satan?

4    A.  Yes, correct.

5    Q.  On April 8, 2018, did the undercover receive a mobile

6    messaging application from Individual A that stated that

7    the money had reached him and that "Inshallah, it should

8    give it to an AQ bro, inshallah"?

9    A.  Yes, that's correct.

10   Q.  So let me back up.

11       In paragraph 21, on April 4 -- I overlooked this part.

12   About halfway through that paragraph, am I right that the

13   defendant, in this same mobile messaging application in a

14   chat on April 4, said "That's why I said send it in small

15   amounts, $200 to $300"?

16   A.  Yes, that's correct.

17   Q.  So in summary, Agent Jones, am I correct that after

18   being introduced to the undercover in February, that by

19   March, she was encouraging -- the defendant was encouraging

20   the UCE to send money?

21   A.  Yes, that's correct.

22   Q.  And that was "You can't have a war without weapons.

23   Supporting a mujahid's family is the same as doing

24   Jihad" -- right?

25   A.  Correct.

1  Q.  And did the defendant introduce the concept of her

2  contact -- by the way, Individual A, have you learned, is

3  an overseas person; is that correct?

4  A.  Yes, that's correct.

5  Q.  And that the defendant introduced the concept of her

6  overseas contact, Individual A, as one who could assist

7  with sending money to mujahedeen and that doing so was the

8  same as doing Jihad?

9  A.  Correct.

10  Q.  And Ms. Abusaad made a specific overt plea for money; is

11  that correct?

12  A.  Yes, that's correct.

13  Q.  And that the defendant confirmed with Individual A that

14  the money could be given to al Qaeda, which is a designated

15  foreign terrorist organization, correct?

16  A.  Yes, that is correct.

17  Q.  And am I right that based on everything you've gone over

18  here today and the full contents of the affidavit, that

19  it's clear that the defendant provided specific directions,

20  coaching, and encouragement for how to send money,

21  including instructing the UCE to use a fake name and to

22  break up the transactions to $200 to $300 at a time and

23  that she facilitated the online introduction of the UCE to

24  Individual A, who could facilitate getting money to

25  al Qaeda?

1    **A.**   That's correct.

2        MR. CORNELIUS:  Can I have one moment, Your Honor?

3        THE COURT:  Uh-huh.

4    (Pause.)

5        MR. CORNELIUS:  Your Honor, we would proffer as a

6    court's exhibit the full affidavit that is document 1 in

7    the court file.  And also as a matter of evidence, we

8    proffer all the pretrial services reports.  I've only seen

9    two, but I understand that a third one has recently been

10   filed.

11       THE COURT:  There was a short supplemental report this

12   morning.

13       MR. CORNELIUS:  Right.  And defense counsel shared with

14   me the import of that.  So the United States offers as

15   court's exhibits document 1, which is the complaint

16   affidavit, and then the three pretrial services reports and

17   the indictment, which, of course, is what triggers the

18   rebuttable presumption, of course.

19   (Court Exhibits 1-5 marked.)

20       MR. CORNELIUS:  And that's all the questions I have --

21   well, actually, I've got one more question.  I'm sorry.  I

22   forgot.

23       THE COURT:  Let me ask Mr. Holmes.  Any objections to

24   receiving those -- I think it will be five exhibits this

25   morning?

1    MR. HOLMES:  No, Your Honor.

2    THE COURT:  All right.  They will be received.

3  (Court Exhibits 1-5 admitted.)

4    MR. CORNELIUS:  Thank you.

5  Q.  Agent Jones, I forgot to ask you another fairly

6  important question.

7    Have you learned that also during this investigation,

8  that a lady was interviewed up in Nashville on October 23?

9  A.  Yes, I'm aware of that.

10  Q.  And that her name is Georgianna Giampietro?

11    And I'll spell that for you later on, okay?

12    Have you learned that?

13  A.  Yes, I have.

14  Q.  And have you learned that the FBI asked Ms. Giampietro

15  some questions about the defendant?

16  A.  Yes, I've learned that.

17  Q.  Including this:  "Did Alaa ever talk to you" -- meaning

18  Ms. Giampietro up in Nashville.  Did Alaa ever talk to

19  Ms. Giampietro about going to Syria.  And Ms. Giampietro

20  said "I mean, we talked about it, but she got married."

21    And then the agent asked Ms. Giampietro "Okay, but did

22  she ever talk to you about how she wanted to go to Syria?"

23  And Ms. Giampietro replied "How she wanted to, yeah."  Am I

24  right?

25  A.  That is correct, yes, sir.

1     MR. CORNELIUS:  Thank you.

2     I pass the witness, Your Honor.

3     THE COURT:  Cross-examination.

4  CROSS-EXAMINATION BY MR. HOLMES:

5  Q.  Agent Jones, the mobile messaging board that we're

6  referring to, how is that accessed?  The Internet?

7  **A.**  It can be accessed via a cellular phone or the Internet

8  is my understanding of that, yes.

9  Q.  So I'm a bit ignorant when it comes to technology, so

10 you're going to have to help me through this.  If it's a

11 cell phone, would the cell phone have to have the Internet

12 capability to access the messaging board?

13 **A.**  I don't know the answer to that, sir.

14 Q.  Okay.  But you're pretty familiar with the affidavit and

15 this operation?

16 **A.**  I'm very familiar with the affidavit.  I have it in

17 front of me, sir.

18 Q.  Okay.  So in your opinion, when these conversations

19 started with the defendant, was she actively pursuing money

20 for a terrorist organization, or was this operation

21 actively pursuing someone to get money to a terrorist

22 organization?

23 **A.**  That's beyond the scope of my understanding, sir.

24 Q.  So when the conversations first started with the

25 defendant, did she immediately start talking about sending

money to a terrorist organization, or was that something
that was brought up by the operation?

MR. CORNELIUS: Your Honor, could I interpose an
objection? I should have done this to begin with. I
thought about filing a motion for protective order.

I want to make sure that there's not an inadvertent
attempt to try to change this hearing into an opportunity
for discovery. And that question -- I mean, I think a lot
of Mr. Holmes. We've known each other for a while. He's a
good lawyer. And I understand he's going to be arguing
entrapment, and that's fine, but I don't know if this is a
setting for that.

We do have discovery we are prepared to turn over as
soon as we get a protective order entered, and he can make
all the entrapment objections or arguments he wants in
front of a trial jury.

That's a long-winded objection to could we restrict him
just to the issues relative to the Bail Reform Act? Thank
you, Judge.

THE COURT: Mr. Holmes, do you have any response to
that?

MR. HOLMES: Your Honor, I will strike that question.
I can simplify that question if the court would allow.

THE COURT: Sure. Go ahead.

Q. (BY MR. HOLMES:) Who brought up a terrorist

1   organization first?

2   A.   I don't know the answer to that, sir.

3   Q.   Okay.

4        The reference of the person that you spoke with that's

5   outside of my realm of knowledge -- I'm not sure who you

6   spoke with that mentioned the defendant and her travels to

7   Syria or attempted travels or desire to travel.  Do you

8   know the last time the defendant left the United States?

9   A.   Not off the top of my head, no, sir.

10  Q.   If I said it, would it possibly refresh your

11  recollection?

12  A.   No.  That's, again, beyond the scope of my

13  understanding, sir.  I have the affidavit in front of me,

14  but I'm not the case agent or lead investigator on this

15  case.

16  Q.   So the information that you received from the defendant

17  about -- information about Individual A that the money

18  could go to, as you sit here today, do you have knowledge

19  that Individual A is associated with a terrorist

20  organization?

21  A.   I believe that's beyond the scope of my understanding,

22  sir.  I have what's presented in the affidavit that's,

23  again, in front of me.

24       MR. HOLMES:  That's all I have, Your Honor.

25       THE COURT:  Redirect?

1    MR. CORNELIUS:  I have no redirect, Your Honor.  Thank
2 you.
3    THE COURT:  All right.  Thank you, sir.  You can step
4 down.  Thank you.
5 (Witness excused.)
6    THE COURT:  Call your next witness.
7    MR. CORNELIUS:  Your Honor, I don't have any further
8 testimony, but I do have -- I'd like to proffer one piece
9 of evidence that's of relatively recent vintage with
10 defense counsel's permission.
11    THE COURT:  Sure.
12    MR. CORNELIUS:  Your Honor -- and then I'd like to
13 offer this piece of evidence and then will we have an
14 opportunity to argue?
15    THE COURT:  Uh-huh.
16    MR. CORNELIUS:  Okay.
17    Very recently, the government has executed a search
18 warrant.  I actually have two search warrants have been
19 executed on the defendant's phone.  And the second search
20 warrant found a portion of a chat that appears as if it had
21 been saved as a screenshot on the defendant's phone.  And
22 it has what appears to be a plea for support from overseas
23 that says "Your brothers here need financial support.  The
24 total cost to fulfill a mujahid's needs is $69.  If anyone
25 can provide the cost of one item, also can contact us for

details."  And then there's a mobile messaging name, the
platform that was being used here.  And then these words
appear:  "Whoever sponsors a fighter in the cause of Allah
has fought."  And then there's what appears to be a
citation to something called "44 Ways to Support Jihad,"
which is a well-known sermon from a radical cleric named
al-Awlaki.  And that sermon is well-known.  And I see these
names come up in these cases.

And the reason that's important, Judge, that that's on
her phone -- so this is -- I'm proffering I could prove
beyond a reasonable doubt who Sheik al-Awlaki was before he
was killed in Yemen and the radical nature of what he
espouses -- or espoused, including that well-known sermon.

So "Whoever sponsors a fighter in the cause of Allah
has fought."  And the defendant said that supporting a
mujahid's family is the same as doing Jihad, which I submit
and I am going to tell the jury in this case that that's
exactly -- we know everything we need to know about this
defendant from that right there.  And it points up the
unbridled danger that this person caused and that will
remain the case if she's not detained.  And with that, I'd
like to just argue if and when that's appropriate.

Thank you.

THE COURT:  All right.  Mr. Holmes, witnesses or
proffers for the defendant?

1     MR. HOLMES:  No, Your Honor.  Just a proffer.

2     I mean, we have the mother and father.  I would love an

3  opportunity to have them come back in the courtroom now

4  that I know that I'm not going to put them on the stand.

5     THE COURT:  If you're not going to call them, they're

6  welcome to come back if you're not going to put them on the

7  stand.

8     MR. HOLMES:  Can I step out, Your Honor?

9     THE COURT:  You may.

10     MR. HOLMES:  Thank you.

11  (Pause.)

12     MR. CORNELIUS:  Your Honor, I may want to proffer one

13  more piece of evidence.

14     THE COURT:  All right.

15  (Pause.)

16     MR. CORNELIUS:  Your Honor, I had to make sure that I

17  had the right status before I went into it.  I wanted to

18  make sure that it wasn't classified.

19     In addition to the al-Awlaki sermon that was found when

20  the government executed search warrants on her phone, the

21  government also --

22     THE COURT:  You didn't find the entire sermon.  You

23  found a citation --

24     MR. CORNELIUS:  Forgive me.

25     THE COURT:  -- to a quotation.

1      MR. CORNELIUS:  Correct.

2      THE COURT:  Okay.

3      MR. CORNELIUS:  Thank you, Judge.

4      THE COURT:  All right.  Go ahead.

5      MR. CORNELIUS:  That's exactly right.

6      There was a search warrant that was served or executed

7  on the defendant's husband's phone as well.  And they found

8  a -- it's called WhatsApp -- a WhatsApp chat between the

9  defendant and her husband that I'm going to not read the

10 whole thing, but --

11     THE COURT:  WhatsApp is the encrypted text messaging

12 application?

13     MR. CORNELIUS:  Yes, Your Honor.

14     THE COURT:  Okay.  Go ahead.

15     MR. CORNELIUS:  And this is in part what the defendant

16 said to her husband.  In part:

17     "My only hobby is baking, and I can cook, but I'm still

18 learning.  I try to keep up with the current affairs of the

19 ummah."  U-M-M-A-H.  And that's the worldwide collection of

20 Muslim believers.

21     Here's the important part:  "Some of the scholars I

22 listen to are Sheik Ahmed Musa Jibril and Sheik Anwar

23 al-Awlaki and Sheik Abdul Razzaq al-Mahdi," which are --

24 you know, they espouse radical views.

25     And she also said in a later WhatsApp chat about the

1   type of man that she was looking for -- this is before -- I

2   mean, this is who she was seeking as a husband, okay?  "He

3   should have a longing to help the ummah physically" -- and

4   that is in all caps -- "and financially to the best of his

5   abilities (will not compromise on this)."

6       Thank you.

7       THE COURT:  Proffer, Mr. Holmes?

8       MR. HOLMES:  Your Honor, we are asking that the

9   defendant be released.  And there was a pretrial service

10  report conducted in the Northern District of Ohio early

11  part of November when she was arrested, and she was

12  extradited here last couple of weeks.

13      And there were just a couple of small errors in that

14  that was corrected by Ms. Shepherd here.  And one of them

15  being her mental health history.  There is no history of

16  mental health.  I think that's been clarified through the

17  probation services here.

18      And I have spoken with her mother and father as well as

19  Ms. Shepherd.  And from the most recent addendum that was

20  emailed to me in the last hour or so -- well, since I've

21  been up here -- was Leigh had some -- Ms. Shepherd had some

22  concerns about the mother being a third-party custodian,

23  one, because she was afraid that she didn't understand her

24  responsibilities as a third-party custodian.  We feel like

25  those are issues that we can certainly clarify.

1    We heard Agent Jones take the stand and testify that

2 the information they have against the defendant was

3 obtained through a message board, which he later testified

4 it can be done with a cell phone as well.

5    As this Court is well aware, there have been many

6 conditions on people's release where they're not allowed to

7 have a cell phone, Internet.

8    From communicating with the family, everybody in the

9 family is willing, if this honorable court would allow her

10 a release, that the mother would be the third-party

11 custodian, that they would disconnect every phone, every

12 Internet, anything they need to do to get their child home,

13 period.

14    There's been no evidence today presented that there was

15 any threat from the defendant other than the message board.

16 Therefore, she can't access the message board without the

17 Internet.  If that is a condition of her bond, then that

18 concern is relieved.

19    Another issue is her ties to a foreign country.  In the

20 initial report from the Northern District of Ohio, that

21 concern, as I interpreted it, was the fact that her father

22 resided in Jordan, which is inaccurate.  Her father resides

23 in Chicago and has not resided in Jordan in over ten years.

24    THE COURT:  The presentence report that I'm looking at

25 that was apparently prepared in Toledo, Ohio, has a

sentence "She," meaning Ms. Abusaad, "reported having two
paternal half-siblings." I take that to be children of her
father by a different mother. "Two paternal half-siblings
who live with their father in Amman, Jordan." So that
would imply not only two half-siblings but also that the
father was in Amman, Jordan.

MR. HOLMES: Yes, sir, and that's the way that I
interpreted it when I initially read it. My travels to
Ohio to meet with the defendant, we clarified that.

The father's here today. He lives in Chicago and has
lived in Chicago for the past ten years. So he does not
reside in Jordan. So I think that alleviates that concern
to a certain degree.

In addition to that --

THE COURT: Are there half-siblings in Amman?

MR. CORNELIUS: There are. There are two
half-siblings, to my understanding, that still reside in
Jordan. But the father of those two half-siblings lives
here in Chicago and has over ten years, for over ten years.

In addition, the concern of her having foreign ties,
the government has all her credentials to travel. They
have her passport. She was 4 years old the last time she
left the United States, Your Honor. I do not think that
the two half-siblings rises to a level of concern for this
court that she would not be present for any court that she

1  needed to be.

2      Her mother is a suitable custodian.  We do have a

3  concern, as reflected in the addendum that Ms. Shepherd

4  presented or emailed at, like, 1:00 that I was unaware of,

5  but her mother resides in a federal housing authority.  And

6  that certainly creates a problem.  As we all are aware,

7  that's going to create a problem for her residing there.

8      I've spoken with the family since I met with them when

9  I first got up here.  They feel certain -- they made some

10  phone calls.  They feel certain that they can get her on

11  the lease.  I have a lack of knowledge how that works, Your

12  Honor.  But they're saying that as long as they can get her

13  on the lease with a background check with the charges

14  pending, she would be allowed to reside at that location.

15      The mother doesn't work.  All she does is provide for

16  her children.  She's got several siblings that live in this

17  house.  The mother's role, grocery store, take them to

18  school, any needs they may have.  So she is the perfect

19  custodian for the defendant.

20      THE COURT:  Do you have any judgment of how long it

21  would take for this process of getting Ms. Abusaad on the

22  lease, suitable background check that's satisfactory to the

23  housing authority?  Are we talking about something that

24  could be done in two or three days, or will it take a week,

25  ten days?  Do you have a judgment how long it might take?

1    MR. HOLMES:  Yes, Your Honor.  I spoke with the family,

2  and she has done this before with previous children.  So

3  we're looking at about a four-to-five-day process.  I feel

4  like maybe if I got involved, I could expedite it.  Maybe.

5    THE COURT:  Okay.

6    MR. HOLMES:  So it would be a little bit quicker.  But

7  they do have to do a background check.  I think it's

8  evident that -- she has no criminal history.  I mean,

9  Toledo, Ohio, did it.  We've done it.  I did it.  She has

10  no criminal history.  The only thing she has is this

11  pending charge.  Which may be a complete bar.  I have no

12  idea.  But I think we can expedite this and have a decision

13  fairly quick to determine whether or not she's eligible to

14  reside there.

15    And if the court would like to directly hear from the

16  family, there's three siblings that live there.  They're

17  all three in school.  Everybody is willing to cut their

18  phones off, cut the Internet off, an ankle monitor,

19  anything to get their child home.  It doesn't matter.  So

20  any condition this court would put on the defendant, she

21  and the family, the third-party custodian is acceptable

22  with any condition the court wants to implement.

23    THE COURT:  Have you discussed with Ms. Abusaad's

24  mother the obligations of a third-party custodian; namely,

25  the three obligations:  first, that she supervise

Ms. Abusaad in connection with any conditions of release
that I might set; number two, that she would use her best
efforts to make sure that Ms. Abusaad comes back here to
court when she's required to be here; and number three, and
perhaps important as any of them, is that if she becomes
aware of any kind of violation of the conditions of release
that I set or that Ms. Abusaad tries to flee or disappears,
that she would immediately report that to the court and the
probation office.  And she needs to understand that if she
fails to comply with any of those conditions, those
requirements of being a third-party custodian, that that
could subject her to a sanction including a contempt of
court citation.  Have you discussed that with her?

MR. HOLMES:  Your Honor, ad nauseam.  So initially
there was a concern in the Northern District of Ohio
because probation had reached out to the mother and the
mother was uncooperative.  Well, partly my fault because
once I was retained, there were threatening phone calls.
There were -- because the media published her home address
in Ohio.  There were people outside of her house.  She was
very concerned about that.  She was concerned that
information was going to be leaked out where she resides in
Tuscaloosa, Alabama.

So I instructed my client to tell her parents, You
don't need to communicate with anybody.  Somebody's got a

1  question about something, you contact me.

2      So, therefore, I didn't realize that probation in the

3  Northern District of Ohio would be reaching out to the

4  mother.  What she did -- and she wouldn't answer any of

5  their questions.

6      So once I met with the family here, I realized that

7  there -- because the custodian, third-party custodian that

8  I have proposed, her first language is Arabic.  She speaks

9  great English but preferably Arabic.

10      I've communicated with her.  I think she understands

11  everything.  Leigh even had some issues because her

12  daughter kept chiming in on responding to some of the

13  questions that she had for the mother when she was

14  interviewing her.

15      So I've communicated with the mother directly in

16  English.  I had a child, one of her children, relay that

17  information in Arabic.  I have reached out and found an

18  Arabic interpreter here in the Northern District that can

19  come to this courtroom and instruct her per your

20  instruction.

21      So I have above and beyond explained to her what her

22  duties would be and what her obligations are and what the

23  consequences are if she doesn't abide by them.  And I have

24  someone in line.  If the court would like me to have them

25  here, I can do it.

1     THE COURT:  Well, it sounds to me -- and Mr. Holmes can
2   certainly correct me if I'm misunderstanding.  But it
3   sounds to me like it's possible -- there's no reason for me
4   to try to make any decision about this unless and until the
5   housing authority situation is clarified and you're able to
6   resolve that.

7     If the housing authority, like you say, says no, that
8   charge is a complete bar, then it may well be that there's
9   no place for Ms. Abusaad to go.  But if the housing
10  authority does allow her, then at that point, I might need
11  to make a decision about whether she's entitled to release
12  or not under the circumstances.

13    All of that to say that perhaps what we should do is
14  simply recess the hearing to give you an opportunity to see
15  if you can work out the housing authority problem.  And if
16  you do, in three or four days or later this week, then we
17  could come back in and hear what you've done.  We can talk
18  about third-party custodial obligations.  You can bring the
19  Arabic interpreter if you want to do that at that time, and
20  we'll see where we go at that point.

21    MR. HOLMES:  Your Honor, thank you.  And I do
22  apologize.  I had spoken with Mr. Cornelius about this
23  issue coming up and whether or not to continue it.  He had
24  everyone here.  There was absolutely no reason not to, in
25  my opinion, to proceed today with this and just kind of see

1   where the court's position was.  So I apologize --

2       THE COURT:  No, that's not -- because there are two

3   ways of handling the situation.  Either we can simply take

4   all of the testimony we can take today except for the

5   housing authority question which is still kind of hanging

6   out there, and then recess the hearing, and then when you

7   have more information about the housing authority, we'll

8   reset the hearing to continue on again and figure out where

9   we are at that point.  Or the alternative is you can

10  present whatever you have today and I can make a decision

11  on that today subject to, of course -- and this is true in

12  every situation -- subject to filing a motion for

13  reconsideration in the event that you get new or additional

14  information from the housing authority.

15      So but in one instance, the process is still

16  continuing.  In the other process, there's a decision --

17  and to be candid with you, I'll have to tell you, absent

18  some fairly clear evidence that Ms. Abusaad's mother can be

19  the third-party custodian and Ms. Abusaad can reside there

20  with her mother, absent clear information of that, I'm

21  going to have to find against releasing her.

22      MR. HOLMES:  Certainly, Your Honor.  I completely

23  understand that.

24      THE COURT:  But -- and so I don't want to mislead

25  anybody about that.  So that's why I'm suggesting to you

1    that there are two ways of handling it.  Either we can
2    recess the hearing for two or three days to let you see if
3    you can work out the housing authority problem.  If so,
4    great; we'll come back and we'll deal with it.  Or we can
5    go ahead and complete the hearing today and I'll make a
6    decision based on what we have right now that I would have
7    to detain her.  But that, of course, that decision would be
8    subject to you filing a motion for reconsideration in two
9    or three days if you get new or additional information from
10   the housing authority.
11        MS. HOLMES:  My preference, Your Honor, is to recess;
12   give me an opportunity, a brief opportunity to get this
13   information from the housing authority, get with the
14   family, get with the interpreter, contact your office and
15   maybe reschedule this as soon as possible.
16        THE COURT:  Okay.
17        Mr. Cornelius, does the government have a position one
18   way or the other about either recessing the hearing for two
19   or three days or do you wish to reserve your arguments for
20   that time or do you want to make them today?  However you
21   want to proceed on it.  And, again, I want to try to
22   cooperate with the government as much as I can to the
23   extent that you need other witnesses or people present for
24   purposes of your presentation, I certainly want to be
25   cooperative with that.

1    MR. CORNELIUS:  I imagine they'll come back, wouldn't

2  y'all?  Come back?

3      I'm not being flippant.  I mean, I -- thank you, Judge.

4  My preference, of course, is not to -- is to detain her.

5      THE COURT:  Oh, I understand.

6      MR. CORNELIUS:  Today.

7      THE COURT:  And I understand that two or three or four

8  days from now that's still going to be your position.

9      MR. CORNELIUS:  Yes, sir.

10      THE COURT:  I understand.

11      MR. CORNELIUS:  There's no use arguing.  I know you've

12  made your decision.  Sounds like you want to do the recess,

13  and so that sounds great to me.

14      THE COURT:  Well, I want to give Ms. Abusaad --

15      MR. CORNELIUS:  Sure.

16      THE COURT:  -- and her family the fairest opportunity

17  that I could give them --

18      MR. CORNELIUS:  I understand.

19      THE COURT:  -- to make the best presentation they can

20  make.

21      MR. CORNELIUS:  Sure.

22      THE COURT:  Because as you point out, this is a charge

23  that creates a presumption against her, creates a

24  presumption in favor of the government in detaining her.

25  And given that presumption, it seems to me it's incumbent

1    upon me in fairness to try to give her and her family the
2    best opportunity they have to make the best case they have
3    to overcome that presumption.
4         MR. CORNELIUS:  Absolutely, Judge.  And the only thing
5    that I was going to say on that point, I read one of your
6    orders on this point, and you clearly -- and it's great
7    because you don't -- sometimes you don't see this.  You
8    know, you said that just because you rebutted the
9    presumption -- just because the defendant -- if the
10   defendant is able to rebut it.
11        THE COURT:  Right.
12        MR. CORNELIUS:  And I submit to you that that hasn't
13   occurred here and they can bring in 15 people who live with
14   her and in that house and they still won't have rebutted
15   it.
16        But assume for a moment that they have.  As this -- I
17   think it's an '07 order you wrote, that it's still a piece
18   of evidence in the case.
19        THE COURT:  Oh, it is.
20        MR. CORNELIUS:  That --
21        THE COURT:  Yeah, the law under the Bail --
22        MR. CORNELIUS:  Right.
23        THE COURT:  -- Reform Act is very clear that even if
24   the presumption is rebutted by the defendant, that
25   presumption remains a factor to be considered --

1        MR. CORNELIUS:  Right.

2        THE COURT:  -- along with all --

3        MR. CORNELIUS:  Right.

4        THE COURT:  -- of the other factors that are set out in

5    3142(g).

6        MR. CORNELIUS:  And that's even more so here, Judge,

7    because Congress added this specifically in terrorism

8    cases.  In 2004, in the Intelligence Reform and Terrorism

9    Prevention Act, Congress decided -- so they're reorganizing

10   the intelligence community, setting up the Office of the

11   Director of National Intelligence, doing all these other

12   things with our counterterrorism apparatus.  And not only

13   did they do that, they also said that if you're charged

14   with one of these offenses, it's our judgment as Congress

15   that you should be detained.

16       And I know that, you know, separate branches of

17   government, of course, you know, you've got to have your --

18   you know, render your judgment.  I know you'll do that.

19   But I submit that there is just no opportunity, there's no

20   combination of factors that will prevent her from doing

21   this again.

22       I respect Mr. Holmes.  He's a wonderful colleague.  But

23   the idea that you're going to have a dozen people living in

24   a Section 8 apartment and no one's going to have their cell

25   phones, whether it's Section 8 or a condominium or a

1    mansion on the hill, it doesn't matter; there's no way to

2    police it.  And she was committing this crime on a dadgum

3    phone.  And that's never going to change.  And all these

4    people, they're just going to -- how do we know they're not

5    going to have phones and that she's not going to be up to

6    the same thing again?

7        And the guys that she was listening to, Judge, they're

8    the worst of the worst.  And they preach hatred and

9    violence -- or until they're killed -- hatred and violence

10    for the people of this country.  We're all the kuffar.

11    Everyone in this courtroom.

12        And so I understand.  I mean -- but, I mean, that's

13    just kind of a preview of what I'll be saying again.

14        THE COURT:  Well, I understand.

15        MR. CORNELIUS:  So --

16        THE COURT:  And I hope that everybody here

17    understands -- the government and Ms. Abusaad understand

18    that it's my obligation to try to make a decision that is

19    consistent with the law of the United States.  And that's a

20    big body of stuff.

21        The law of the United States is not just the Bail

22    Reform Act and is not just the Antiterrorism Act.  It's

23    also the Constitution and, in the Constitution, the legal

24    traditions that we have in this country of fairness and

25    absence of prejudice and bias.  And I'm going to do

1  everything I can to make as fair a decision as I can make

2  based on the law of this country.

3      MR. CORNELIUS:  Absolutely.

4      THE COURT:  And I will try to assure everybody that

5  that's -- that's an oath that I took 32 years ago that

6  still means a lot to me; that I follow that oath and

7  protect and defend the Constitution, and I plan to do that.

8      All right.  Let's be in recess, then.  Let's say

9  tentatively -- what does Thursday look like, Angela?

10     MR. CORNELIUS:  Judge, I'm going to be out of town on a

11 long-scheduled family trip.  I leave tomorrow at 5:00 in

12 the morning, and I get back -- I'm not back till Friday at

13 6:30 p.m.  And the assigned counsel, the guy that I'm

14 working the case with, is out of the country.

15     THE COURT:  But you'll be back next week?

16     MR. CORNELIUS:  Yes, sir.

17     THE COURT:  Okay.  All right.

18     MR. HOLMES:  Your Honor, it's the holidays.  So I will

19 tell you that I'm leaving the country Wednesday afternoon

20 at 6:00 and will not be returning until --

21     THE COURT:  Day after tomorrow?

22     MR. HOLMES:  No, sir.  The following Wednesday.

23     THE COURT:  The following Wednesday?

24     MR. HOLMES:  The following Wednesday afternoon, I leave

25 and will not be back until December 27.

1    THE COURT:  If we set something on Monday of next week,
2  you would be here, right?
3    MR. HOLMES:  I will be here with bells on.
4    THE COURT:  And Mr. Cornelius will be here.
5    MR. CORNELIUS:  Checking my calendar right now.
6    THE COURT:  Sure, yeah.
7    MR. CORNELIUS:  Yes, sir.
8    THE COURT:  Monday?
9    MR. CORNELIUS:  Monday, Tuesday, or -- oh, Wednesday's
10  not good for you.  So Monday and Tuesday, I'm wide open.
11    MR. HOLMES:  I can do Wednesday.  Wednesday afternoon
12  at 6:00 is when I --
13    THE COURT:  Okay.  If we set something Monday at 2:00
14  in the afternoon -- I'm trying to think about the time on
15  Monday.  I'd like to set it early enough in the day that in
16  the event I decide that Ms. Abusaad can be released, that
17  there would be time to get her released that afternoon.  On
18  the other hand, I certainly also want to set it late enough
19  in the day to give everybody an opportunity to get all your
20  ducks in a row to come to the hearing.  So we could say
21  11:00 Monday morning or we could say 1:00 Monday afternoon.
22    MR. HOLMES:  Either time is fine with me, Your Honor.
23  Earlier the better, but I'm available both.
24    THE COURT:  Mr. Cornelius, you have any thoughts?
25    MR. CORNELIUS:  Judge, I'm available at any time that

suits the court.

I will say this. I don't want to borrow trouble for myself, but we would be asking for a stay --

THE COURT: I understand.

MR. CORNELIUS: -- to have it reviewed.

THE COURT: I understand.

MR. CORNELIUS: I don't mean that --

THE COURT: No, no. I understand completely.

MR. CORNELIUS: -- with any disrespect.

THE COURT: In the event -- and I certainly have not made a decision one way or the other, other than, as I said earlier, that based on what I have right now -- and I understand that Mr. Holmes is trying to get something else. But based on what I have right now, my decision would be to detain her. But that could change depending on what Mr. Holmes comes up with.

So let's say 11:00 Monday. That would be Monday, the 17th, at 11:00. And we'll hear any additional evidence or presentation, Mr. Holmes, that you might have at that time, and we'll figure out where we are at that point.

MR. HOLMES: Thank you.

THE COURT: Okay?

MR. CORNELIUS: Thanks, Judge. I'm sorry about my travel. We'd already --

THE COURT: No, I'm just envious of all of you that

```
 1   y'all get to travel.

 2        MR. CORNELIUS:  Right.

 3        THE COURT:  I don't get that opportunity.

 4        MR. HOLMES:  Your Honor, I have four young boys if

 5   you'd like to travel with them.

 6        THE COURT:  I'll pass on that.

 7        MR. CORNELIUS:  Thank you, Judge.

 8        THE COURT:  Thank you very much.  Anything else from

 9   the government?

10        MR. CORNELIUS:  No, Your Honor.

11        THE COURT:  Mr. Holmes, anything else?

12        MR. HOLMES:  No, Your Honor.

13        THE COURT:  All right.  We'll be in recess, then, till

14   Monday the 17th at 11:00.  Thank you very much.

15   (The proceedings were concluded.)

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E

I, Sabrina Lewis, RDR, CRR, Official Court Reporter for the United States District Court for the Northern District of Alabama, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the court and the Judicial Conference of the United States.

Dated:  December 19, 2018

*Sabrina Lewis*

SABRINA LEWIS, FEDERAL OFFICIAL COURT REPORTER